# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                          :
In re                                     :   Chapter 11
                                          :
MOLYCORP, INC, et al.,¹                   :   Case No. 15- 11357 (____)
                                          :
           Debtors.                       :   (Joint Administration Pending)
                                          :
------------------------------------------------------------x
```

## MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING THE CONTINUED USE OF THE DEBTORS' CASH MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS; (II) PERMITTING CERTAIN INTER-DEBTOR TRANSACTIONS, INTERCOMPANY TRANSACTIONS AND SETOFFS AND (III) GRANTING RELATED RELIEF

The above-captioned debtors (collectively, the "Debtors") hereby move the Court

for the entry of an order pursuant to sections 345, 363, 503(b)(1), 553(a) and 558 of title 11 of

the United States Code (the "Bankruptcy Code") (i) approving the Debtors' continued use of

(a) their current cash management system (as such system may be augmented as a result of

proposed debtor in possession financing) and (b) the Debtors' existing bank accounts and

business forms, including authorizing the Debtors to open and close bank accounts, (ii) granting

the Debtors a waiver of the requirements of section 345(b) of the Bankruptcy Code approval of

the Debtors' current investment and deposit guidelines, (iii) authorizing all banks participating in

---

[1]    The Debtors are the following 21 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses):  Molycorp, Inc. (1797); Industrial Minerals, LLC; Magnequench, Inc. (1833); Magnequench International, Inc. (7801); Magnequench Limited; Molycorp Advanced Water Technologies, LLC (1628); MCP Callco ULC; MCP Canada Holdings ULC; MCP Canada Limited Partnership; MCP Exchangeco Inc.; Molycorp Chemicals & Oxides, Inc. (8647); Molycorp Luxembourg Holdings S.à r.l.; Molycorp Metals & Alloys, Inc. (9242); Molycorp Minerals Canada ULC; Molycorp Minerals, LLC (4170); Molycorp Rare Metals Holdings, Inc. (4615); Molycorp Rare Metals (Utah), Inc. (7445); Neo International Corp.; PP IV Mountain Pass, Inc. (1205); PP IV Mountain Pass II, Inc. (5361); RCF IV Speedwagon Inc. (0845).  Molycorp's United States headquarters is located at 5619 DTC Parkway, Suite 1000, Greenwood Village, Colorado 80111.

the cash management system to honor the Debtors' directions regarding certain transfers and charge bank fees and certain other amounts and (iv) permitting continued inter-Debtor and intercompany transactions, granting administrative expense priority status to all postpetition claims arising from Inter-Debtor Transactions (as defined below) and postpetition intercompany claims held by a Debtor against one or more of the other Debtors and permitting certain intercompany setoffs.  In support of this Motion, the Debtors incorporate the statements contained in the Declaration of Michael F. Doolan in Support of First-Day Pleadings (the "First Day Declaration") filed contemporaneously herewith and further respectfully state as follows:

## Background

1.      On the date hereof (the "Petition Date"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  By a motion filed on the Petition Date, the Debtors have requested that their chapter 11 cases be consolidated for procedural purposes only and administered jointly.

2.      The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference dated February 29, 2012, from the United States District Court for the District of Delaware.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      Molycorp, Inc. is a Delaware corporation and is a direct or indirect parent of the Debtors and each of the Debtors' nondebtor affiliates (collectively, "Molycorp").  Molycorp is a leading global rare earths and rare metals producer with a workforce of

approximately 2,530 employees at locations on three continents.  Molycorp has in excess of $1.7 billion in outstanding secured and unsecured debt obligations.  Molycorp operates a vertically integrated, global supply chain that combines a world-class rare earths resource with manufacturing facilities that can produce a wide variety of custom engineered, advanced rare earth materials.  The products produced by Molycorp are critical inputs in many existing and emerging applications, including hybrid and electric vehicles, wind power turbines, mobile devices, fiber optics, lasers, hard disk drives, guidance and control systems, global positioning systems and advanced water treatment technology.

5.      Molycorp's Mountain Pass Rare Earth Facility ("Mountain Pass") in San Bernardino County, California is the foundation of Molycorp's vertical integration strategy.  It is home to one of the world's largest and richest deposits of rare earths.  Molycorp acquired the Mountain Pass facility in 2008, at which time the mining operations were in care and maintenance and the processing operations were in limited production, based on existing feedstocks.  In 2012, Molycorp also acquired Neo Material Technologies Inc. (now known as Molycorp Minerals Canada ULC) to permit Molycorp to execute on its vertical integration strategy and permit it to become a leading global producer, processor and developer of rare earths and rare metals.

6.      Molycorp has been cash flow negative in recent years as it made significant capital expenditures to modernize and expand its production capabilities at the Mountain Pass facility.  Rare earth pricing has trended negative in recent years due to a variety of factors, including the impact of Chinese competition.  Delays in the Mountain Pass ramp-up and these pricing trends caused Molycorp to experience liquidity pressures from time to time, most recently beginning in mid-2014.  While a September 2014 financing with affiliates of and

funds managed by Oaktree Capital Management L.P. ("Oaktree") gave Molycorp additional liquidity to continue its ramp-up, Molycorp concluded that it would need a more fulsome restructuring of its liabilities.

7.    Molycorp thus began engaging with its various creditor constituencies in early 2015. As described in more detail in the First Day Declaration, those discussions led to the Debtors entering into a restructuring support agreement (the "Restructuring Support Agreement") just prior to the Petition Date with an ad hoc group of holders of the Debtors' 10% Senior Secured Notes (the "Supporting 10% Noteholders"). The Restructuring Support Agreement contemplates pursuit of a plan of reorganization that provides liquidity to the Molycorp businesses and substantially de-levers Molycorp's balance sheet. In addition, the Debtors have negotiated the terms of a $225 million debtor in possession financing facility that will be provided by certain of the Debtors' 10% Senior Secured Noteholders (potentially including certain parties that are not part of the Supporting 10% Noteholder group) (the "DIP Lenders") and which is convertible, subject to conditions, into an exit facility under the proposed plan. This financing facility provides the Debtors with a significant funding source that can be utilized while the Debtors seek to pursue a plan of reorganization that implements the terms of the Restructuring Support Agreement.

8.    The Debtors believe that the commencement of these chapter 11 cases and implementation of the Restructuring Support Agreement will allow Molycorp to address its long-term liquidity and balance sheet concerns and emerge from chapter 11 as part of a restructured Molycorp.

### The Debtors' Cash Management System

9.    In the ordinary course of business, the Debtors operate a cash management system (the "Cash Management System") involving 42 domestic and foreign bank accounts

(collectively, the "Bank Accounts").[2]  The Cash Management System provides a well-established mechanism for the collection, management and disbursement of funds used in the Debtors' business.

10.    The principal components of the Cash Management System and the flow of funds through the system are described below:[3]

(a)    **Operating Accounts**. The Debtors maintain operating accounts at Wells Fargo Bank ("Wells Fargo") and other banks.  These operating accounts are the focal points of the Cash Management System.

(i)    Mountain Pass Operating Account.  The Debtors maintain an operating account (the "Mountain Pass Operating Account") with Wells Fargo. Substantially all of the collections and disbursements related to the Debtors' operations at Mountain Pass flow into and through the Mountain Pass Operating Account.

(ii)    Overnight Account.  Excess funds that remain in the Mountain Pass Operating Account (after disbursements) are transferred nightly into an overnight account with Wells Fargo (the "Overnight Account").  Funds in the Overnight Account are invested into an interest bearing bank deposit.  Funds in the Overnight Account are automatically transferred back to the Mountain Pass Operating Account at the opening of each business day.

(iii)    Additional Operating Accounts.  The Debtors maintain nine operating accounts (the "Additional Operating Accounts") to make disbursements and receive payments related to the Debtors' North American operations other than at Mountain Pass.  Seven accounts are held at Wells Fargo and PNC Bank.  Excess funds that remain in these seven accounts are transferred nightly into the Overnight Account. Two additional operating accounts are held at Wells Fargo and PNC Bank.  Funds remain in these accounts overnight and are not swept into the Overnight Account.

(iv)    Molycorp, Inc. Operating Account.  Debtor Molycorp, Inc. maintains an account at Wells Fargo primarily for the payment of its various debt

---

[2]    This figure does not include the account being opened in connection with the Debtors' postpetition financing facility.

[3]    A chart summarizing the Cash Management System and a schedule of the Bank Accounts are attached hereto as Exhibits A and B respectively.

service obligations and to receive receipts from certain of its affiliates (the "Molycorp, Inc. Operating Account"). The Debtors also fund this account from the Corporate Investment Accounts (as defined below) on an as needed basis.

(b)  **Cash Collection Accounts**. The Debtors maintain cash collection and lockbox accounts to receive cash generated from the sale of their products to customers.

    (i)  Lockbox Account. Collections received from the Debtors' operations at Mountain Pass and certain of its other business segments are received and deposited into one lockbox account at Wells Fargo. The funds in the lockbox account are transferred on a daily basis to the Mountain Pass Operating Account or one of the additional Wells Fargo operating accounts described above based upon the business segment to which the payment relates.

    (ii)  Depository Accounts. The Debtors also collect payments through a depository account with Wells Fargo and through certain of its Additional Operating Accounts.

(c)  **Investment Accounts**. In addition to the investments made through the Overnight Account, the Debtors invest corporate funds through two accounts, one with Wells Fargo Securities and one with Oppenheimer & Co. (collectively, the "Corporate Investment Accounts"). The funds held in the Corporate Investment Accounts are placed in funds consistent with the Debtors' investment policy. The Debtors transfer funds from these accounts on an as needed basis to the Mountain Pass Operating Account or to the Molycorp, Inc. Operating Account.

(d)  **Disbursement Accounts**. In order to fund operations, the Debtors transfer funds to controlled disbursement accounts (the "Disbursement Accounts") as set forth below:

    (i)  Payroll. The Debtors maintain an account at Wells Fargo for the payment of payroll and related expenses at Mountain Pass. The Debtors fund this account from the Mountain Pass Operating Account on an as needed basis consistent with the payroll cycle.

    (ii)  Operations Disbursement. The Debtors maintain three accounts primarily for the payment of vendors and other miscellaneous expenses. One account is at Wells Fargo and two are with the Royal Bank of Canada. The Debtors fund these accounts from the Mountain Pass Operating Account or the Corporate Investment Accounts on an as needed basis.

(e)  **Special Purpose Accounts**. Various special purpose accounts are described below:

(i)    <u>Collateral Accounts</u>.  The Debtors maintain a collateral account at Wells Fargo.  This account holds $1.76 million to secure the Debtors' obligations related to (a) a corporate credit card program with Wells Fargo and (b) an undrawn letter of credit supporting their Owner Controlled Insurance Program (the "<u>OCIP</u>").  Another account at U.S. Bank N.A., in the name of U.S. Bank N.A., as trustee for the Hartford Services Trust Account, holds $450,006 that was posted by the Debtors as cash collateral to secure the Debtors' obligations under the OCIP.

(ii)    <u>Debt Service Trust Accounts</u>.  Six trust accounts in the name of Wells Fargo, as indenture trustee of the Debtors' outstanding notes, are used to facilitate debt service payments.

(f)    **Foreign Operation Accounts**.  The Debtors maintain accounts related to foreign operations as set forth below:

(i)    <u>U.S. Operating Accounts for Foreign Operations</u>.  Each of the Debtors in Canada and Barbados maintain accounts in the United States related to their operations.  Each of the seven accounts are held at Wells Fargo.

(ii)    <u>Molycorp Minerals Canada ULC</u>.  The Debtors maintain two accounts with Royal Bank of Canada to facilitate payments to vendors and collections from customers.

(iii)    <u>MCP Canada Limited Partnership Account</u>.  The Debtors maintain an account with Royal Bank of Canada to facilitate Intercompany Transactions (as defined below).

(iv)    <u>Neo International Corp. and Magnequench Ltd. Accounts</u>.  The Debtors maintain four accounts with RBC Royal Bank (Barbados), which generally collect dividends from foreign affiliates.

(v)    <u>Molycorp Luxembourg Holdings Account</u>. The Debtors maintain one account with ING (Luxembourg) to satisfy various Luxembourg legal requirements.  The account sees limited use.

(vi)    <u>Magnequench International Accounts</u>. The Debtors maintain two accounts in Japan (one at the Bank of Tokyo-Mitsubishi UFJ and one at Sumitomo Mitsui Banking Corporation) to facilitate Debtor Magnequench International Inc.'s operations in Japan.

(g)    **Limited Use Accounts**.  The Debtors maintain several accounts that see limited or nominal use, as described below:

(i)    <u>Molycorp Minerals, LLC Account</u>.  The Debtors maintain an Estonian bank account at Swedbank AS to pay certain monthly fees related to

debtor Molycorp Minerals, LLC's shares in nondebtor-affiliate, Molycorp Silmet AS, as such fees must be paid in local currency. The Debtors deposit approximately $3,500 annually into the account to pay such maintenance fees.

(ii)    <u>Molycorp Advanced Water Technologies Account</u>. The Debtors maintain an account at PNC Bank in the name of Molycorp Advanced Water Technologies, LLC, which is a largely dormant entity.

(iii)    <u>Miscellaneous Molycorp Inc. Accounts</u>. The Debtors maintain two accounts with HSBC Bank in Canada. These accounts were initially established in connection with a potential credit facility transaction. The credit facility transaction did not occur, and the accounts now see limited use.

## Legal Basis for Relief Requested

***The Continued Use of the Cash Management System,***
***Bank Accounts and Business Forms Is Essential to the Debtors' Ongoing***
***Business and is in the Best Interests of the Debtors' Respective Estates and Creditors***

### *Cash Management System and Bank Accounts*

11.    The Debtors hereby seek authority to continue to use the Cash Management System, including as modified by the requirements of the Debtors' postpetition financing facility (the "DIP Facility"). In light of the substantial size and complexity of the Debtors' international operations, significant disruptions to the Debtors' business would be highly likely if the cash management procedures must be quickly altered. As such, it is essential that the Debtors be permitted to maintain their cash management system largely in its current format.

12.    Absent the ability to maintain their Cash Management System, the Debtors would have to significantly alter their business operations to comply with United States Trustee established guidelines (the "UST Guidelines").[4] The Cash Management System provides benefits to the Debtors, such as enabling them to: (i) control and monitor corporate funds;

---

[4]    Among other requirements, the United States Trustee guidelines with respect to a debtor's cash management system include: (i) closing all existing bank accounts and open new debtor in possession accounts; and (ii) maintaining separate debtor in possession accounts for various items.

(ii) invest idle cash; (iii) ensure cash availability; and (iv) reduce administrative expenses by facilitating the movement of funds. These benefits are especially important here given the significant volume of cash transactions managed through the Cash Management System.

13.     Given the Debtors' corporate and financial structure, the decentralized nature of the Debtors' operations and the number of affiliated entities participating in the Cash Management System, it would be difficult and unduly burdensome for the Debtors to establish an entirely new system of bank accounts and a new cash management and disbursement system for each of the 21 legal entities that comprise the Debtors. Removing this burden will help the Debtors' employees focus on key restructuring tasks instead of devoting their attention to constructing a new cash management system, and thus is in the best interests of the Debtors' estates and creditors.

14.     The Debtors further seek authority to implement ordinary course changes to their Cash Management System as the Debtors may determine that other changes in the Cash Management System are beneficial to their business. As part of these ordinary course changes, the Debtors request authority to open and close bank accounts, including a bank account being opened in connection with the DIP Facility. The Debtors request that the Banks (as such term is defined below) be authorized to honor the Debtors' requests to open or close any bank accounts, provided, however, that any new domestic account is established at a bank insured with the Federal Deposit Insurance Corporation ("FDIC") or the Federal Savings and Loan Insurance Corporation (the "FSLIC") and that is organized under the laws of the United States or any State therein, or in the case of accounts that may carry a balance exceeding the insurance limitations set thereby, on the list of authorized bank depositories for the District of Delaware.

15.     Bankruptcy courts routinely permit chapter 11 debtors to maintain their existing cash management systems and Bank Accounts, generally treating requests for such relief as a relatively "simple matter." In re Baldwin-United Corp., 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987); see also In re Columbia Gas Sys., 997 F.2d 1039, 1061 (3d Cir. 1993) (recognizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient"); Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.), 778 F.2d 617, 621 (11th Cir. 1985) (holding that allowing the debtors to use their prepetition "routine cash management system" was entirely consistent with applicable provisions of the Bankruptcy Code).

16.     Further, the continued postpetition use of cash management systems and continued use of the prepetition bank accounts also has been approved as a routine matter in other bankruptcy cases in this District.  See, e.g., In re RadioShack Corp., No. 15-10197 (BLS) (Bankr. D. Del. Mar. 9, 2015) ("RadioShack Order"); In re Old FENM Inc., No. 13-12569 (KJC) (Bankr. D. Del. Oct. 1, 2013) ("Old FENM Order"); In re MSD Performance, Inc., No. 13-12286 (PJW) (Bankr. D. Del. Sept. 9, 2013) ("MSD Order"); In re OnCure Holdings, Inc., No. 13-11540 (KG) (Bankr. D. Del. Jul. 23, 2013) ("OnCure Order"); In re AFA Investment Inc., No. 12-11127 (MFW) (Bankr. D. Del. Apr. 3, 2012) ("AFA Investment Order"); In re Harry & David Holdings, Inc., No. 11-10884 (MFW) (Bankr. D. Del. Mar. 29, 2011) ("Harry & David Order").

17.     The Debtors respectfully submit that under the circumstances, the maintenance of the Cash Management System and Bank Accounts in substantially the same form as it existed prior to the Petition Date (or as the Debtors may modify the system in the ordinary course of business) is in the best interests of the Debtors' estates and creditors.

*Business Forms*

18.     In the ordinary course of their business, the Debtors use a multitude of checks and other business forms.  By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with which the Debtors deal on a regular basis, it is important that the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change.  Pursuant to Rule 2015-2(a) of the Local Rules for the Bankruptcy Court for the District of Delaware (the "Local Rules"), and to avoid disruption of the Cash Management System and unnecessary expense, the Debtors request that they not be required to include the legend "D.I.P." and the corresponding bankruptcy case number on any business forms or checks.  Absent this relief, the estates will be required to bear potentially significant and unnecessary expenses, which the Debtors respectfully submit is unwarranted.

19.     As parties that presently conduct business with the Debtors likely will be aware of the Debtors' status as debtors in possession, the alteration of the Debtors' checks and business forms would be unnecessary and unduly burdensome.  Further, this Court has allowed debtors to use their prepetition business and check forms without the "D.I.P." label in other large cases.  See, e.g., RadioShack Order; Old FENM Order; MSD Order; OnCure Order; AFA Investment Order.

**Request for a Waiver of Section 345(b)
Investment and Deposit Guidelines**

20.     With the exception of the two Corporate Investment Accounts, the Debtors' domestic bank accounts are insured by the United States through the FDIC.  Many of the Banks have executed a Uniform Deposit Agreement ("UDA") with the United States Trustee for the District of Delaware (the "U.S. Trustee").  Accordingly, the Debtors believe that the use

of the domestic accounts substantially complies with section 345(b) of the Bankruptcy Code. In addition, the Debtors utilize foreign bank accounts to hold limited amounts of cash in safe, stable banking institutions. Prior to the Petition Date, the Debtors also invested funds in stable investments in accordance with their Investment Policy (as defined below). By this Motion, the Debtors seek an interim waiver of section 345(b) to permit them to continue to deposit funds in their domestic and foreign bank accounts, including any account created in connection with the DIP Facility (the "Deposit Guidelines") and permit them to invest funds in accordance with the Investment Policy. This interim waiver would ripen into a permanent waiver unless a party in interest objects in the first 45 days of these bankruptcy cases.

21.    Pursuant to section 345(b) of the Bankruptcy Code, any deposit or other investment made by a debtor, except those insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, must be secured by either a bond in favor of the United States that is secured by the undertaking of a corporate surety approved by the U.S. Trustee for the relevant district or the deposit of securities of the kind specified in 31 U.S.C. § 9303. Section 345(b) also provides, however, that a bankruptcy court may allow the use of alternatives to these approved investment guidelines "for cause." See 11 U.S.C. § 345(b); In re Serv. Merch. Co., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

22.    In the Service Merchandise case, the court identified the following factors as a guide for determining whether cause exists to waive the requirements of section 345(b) of the Bankruptcy Code:

(a)    the sophistication of the debtor's business;

(b)    the size of the debtor's business operations;

(c)    the amount of investments involved;

(d)     the bank ratings of the financial institutions where the debtor's funds are held;

(e)     the safeguards in place within the debtor's own business for insuring the safety of the funds;

(f)     the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(g)     the benefit to the debtor of current practices;

(h)     the harm, if any, to the estate; and

(i)     the reasonableness of the debtor's request for relief from the section 345(b) requirements in light of the overall circumstances of the case.

Id. Examining these factors, the Service Merchandise court concluded that "cause" existed in that case because the debtors were "large, sophisticated [companies] with a complex cash management system" that had the ability to shift money as needed to ensure the safety of their funds. Id. Moreover, the benefits to the debtor of waiving the section 345(b) requirements far outweighed any potential harm to the estate, and the failure to waive the requirements "would needlessly handcuff these debtors' reorganization efforts." Id. at 896-97.

23.     As in Service Merchandise and the other chapter 11 cases in which courts in this District have granted requests for approval of the continued use of prepetition deposit guidelines, the Debtors are large, sophisticated companies with a complex Cash Management System. The Debtors' domestic accounts are largely with stable banks. The Debtors' use of foreign accounts (as described above) also is necessary for the Debtors' operations. Limited funds are held in these accounts. These foreign accounts are with large, stable banks (i.e., HSBC Bank (Canada); Royal Bank of Canada; RBC Royal Bank (Barbados); ING (Luxembourg); Bank of Tokyo-Mitsubishi UFJ; and Sumitomo Mitsui Banking Corporation). Given the stability of these foreign banks, the Debtors believe there is no meaningful risk to the cash held in such accounts, and cause therefore exists to waive the requirements of section 345(b) of the

Bankruptcy Code. In light of these factors, the Debtors respectfully request that cause be found for any noncompliance with section 345(b) with respect to the Deposit Guidelines, subject to the provisions of paragraph 25 below.

      24.    The Debtors also have historically invested certain funds in accordance with the Debtors' Investment Policy.[5] As of the Petition Date, the Debtors are investing less than $4 million in one Corporate Investment Account. The funds currently are invested in high-quality, short-term, U.S. dollar-denominated money market instruments. These accounts and investments are safe, prudent, commercially reasonable and satisfy the goal of protecting principal (even if they do not strictly comply with all of the requirements of section 345 of the Bankruptcy Code). In light of the requirements of the DIP Facility, which requires that DIP Facility proceeds be held in a segregated account until they are ready for use, the Debtors do not expect that they commonly will have significant cash available to invest under the Investment Policy. Nonetheless, to the extent the Debtors have idle cash that is not required to be put to some other use under the DIP Facility, the Debtors seek authority to continue to invest funds under the Investment Policy. Given the safety and nature of the investment vehicles the Debtors utilize to invest idle cash pursuant to the Investment Policy: (i) the Debtors should be authorized to invest and deposit idle funds in accordance with the Investment Policy notwithstanding that such guidelines may not strictly comply in all respects with the approved investment guidelines

---

[5]    The Investment Policy allows short term investments that may include (i) U.S. Treasury bills, notes and bonds with remaining maturities not to exceed 12 months, (ii) debt obligations issued by U.S. government agencies, such as the Federal National Mortgage Association (FNMA), the Federal Home Loan Mortgage Corporation (FHLMC), the Federal Home Loan Bank (FHLB) and the Federal Farm Credit Bank (FFCB) with a remaining maturity of 12 months or less, (iii) diversified money market funds subject to Rule 2a-7 promulgated under the Investment Company Act of 1940, 15 U.S.C. 80a-1 et seq., and (iv) certificates of deposit, eurodollar time deposit, banker's acceptance, bank note or letter of credit, with a maturity of 12 months or less (collectively, the "Investment Policy").

set forth in section 345 of the Bankruptcy Code and (ii) all applicable institutions be authorized and directed to accept and hold or invest such funds in accordance with the Investment Policy.

25.     Local Rule 2015-2(b) provides that if a motion for a waiver under section 345 of the Bankruptcy Code is filed on the first day of the case, and there are more than 200 creditors, the court may grant an interim waiver.  As this Motion is being filed on the first day of the Debtors' chapter 11 cases and the Debtors have in excess of 200 creditors, by this Motion the Debtors request that the Court enter an order approving, on an interim, 60-day basis, the Deposit Guidelines and investments made consistent with the Investment Policy.  The proposed order granting this motion would provide that if the U.S. Trustee (or any statutory committee appointed in these chapter 11 cases) files an objection to the Debtors' Deposit Guidelines or Investment Policy within 45 days after the entry of the order granting the relief requested herein and such objection is not resolved or withdrawn before expiration of the 60-day period following entry of the order, the Debtors will schedule a prompt hearing before the Court to renew their request for waiver under section 345(b) of the Bankruptcy Code.  During the extension period, the Debtors will engage in discussions with the U.S. Trustee and any statutory committee appointed in these chapter 11 cases to determine whether modifications to the Deposit Guidelines and Investment Policy are appropriate under the circumstances.  In the event that no objection is filed, the Debtors will submit an order under certification of counsel providing that such waiver is granted on a final basis.

26.     Courts in this District have permitted similar and longer extensions in other comparable chapter 11 cases.  See, e.g., In re Altegrity, No. 15-10226 (Bankr. D. Del. March 16, 2015) (authorizing an interim waiver of section 345(b) and providing that a final hearing will be held if an objection is filed before the deadline); In re Neb. Book Co., No. 11-

12005 (Bankr. D. Del. June 28, 2011) (granting interim waiver of section 345(b)); In re Stallion

Oilfield Servs. Ltd., No. 09-13562 (Bankr. D. Del. Oct. 20, 2009) (granting an interim waiver of

section 345(b) and providing that waiver shall become final if no timely objections are filed); In

re Masonite Corp., No. 09-10844 (Bankr. D. Del. Mar. 17, 2009) (granting an interim waiver of

section 345(b) and providing that waiver shall become final if no timely objections are filed).

***The Court Should Authorize Banks
Participating in the Cash Management System
to Honor the Debtors' Directions Regarding Certain
Transfers and Charge Bank Fees and Certain Other Amounts***

27.    Contemporaneously with the filing of this Motion, the Debtors have filed

various motions for authorization to pay certain prepetition debt.  With respect to some of this

debt, prior to the Petition Date, the Debtors issued checks that have yet to clear the banking

system.  With respect to other debt, the Debtors intend to issue checks postpetition on account of

such prepetition debt once the Court enters an order permitting the Debtors to take such action.

The Debtors intend to inform their banks which prepetition checks the Debtors' bank should

honor pursuant to orders of the Court authorizing such payment.

28.    As a result of the foregoing, the Debtors request their banks and financial

institutions (collectively, the "Banks") be authorized to accept and honor all representations from

the Debtors as to which checks, drafts, wires or ACH transfers should be honored or dishonored

consistent with any order of this Court and governing law, whether such checks, drafts, wires or

ACH transfers are dated prior to, on or subsequent to the Petition Date.  Pursuant to the relief

requested in this Motion, the Banks will not be liable to any party on account of (i) following the

Debtors' instructions or representations as to any order of this Court, (ii) the honoring of any

prepetition check or item in a good faith belief that the Court has authorized such prepetition

check or item to be honored or (iii) an innocent mistake made despite implementation of

reasonable item-handling procedures. Such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

29.     Finally, the Debtors request authority for the Banks to debit the Bank Accounts in the ordinary course of business without further order of the Court for: (i) all checks drawn on the Bank Accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtors' accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) all prepetition and postpetition service and other fees, costs, charges and expenses to which the Banks may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors (collectively, the "Bank Fees"), including undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Banks as service charges for the maintenance of the Cash Management System. Bank Fees for Molycorp recently have been approximately $11,000 per month.

30.     The Debtors require this relief to minimize the disruption of the Cash Management System and their Bank Accounts and to assist them in accomplishing a smooth transition to operating in chapter 11. Authority for debtors to pay bank fees and banks to charge back returned items has been routinely granted in other chapter 11 cases. See, e.g., RadioShack Order; Old FENM Order; MSD Order; OnCure Order; AFA Investment Order; Harry & David Order.

**_Permitting Continued Inter-Debtor Transactions and_**
**_Intercompany Transactions and Granting Administrative_**
**_Expense Status to Intercompany Obligations is Appropriate_**

31.     Historically, the Debtors have engaged in a variety of intercompany financial transactions (collectively, the "Inter-Debtor Transactions") in the ordinary course of business.  In particular, from time to time, certain of the Debtors loaned monies to Molycorp, Inc. in order to fund general corporate overhead expenses or to provide cash to make interest payments on long-term debt.  Moreover, many Debtors have loaned monies to Molycorp Minerals, LLC in order to help fund the modernization and expansion of the production capabilities at the Mountain Pass facility.  The Debtors intend to continue these types of Inter-Debtor Transactions, to the extent necessary, during these bankruptcy cases.

32.     The continuation of the ordinary course Inter-Debtor Transactions is important to the Debtors' business plan and is an assumption in the DIP Facility budget.  Absent authority to continue these transactions, the Debtors' need under their DIP Facility would be increased.  Thus, it is imperative that the Debtors be permitted to continue to engage in the Inter-Debtor Transactions during these bankruptcy cases.  In particular, if the Debtors cannot continue to loan monies to certain of the other Debtors, (i) Molycorp, Inc. may not have sufficient funds to pay general corporate and overhead costs and (ii) the Mountain Pass facility may not receive the funds necessary to complete the ramp-up and optimization of the Mountain Pass facility.  Accordingly, the Debtors submit that the continuation of these transactions is in the best interests of the Debtors' estates and creditors.

33.     Likewise, prior to the Petition Date, the Debtors and certain non-Debtor affiliates (the "Non-Debtor Affiliates") engaged in intercompany transactions with each other in the ordinary course of business (collectively, the "Intercompany Transactions").  In particular, certain of the Debtors purchase goods from and/or sell goods to other Debtors.  The Debtors also

engage in such transactions with their Non-Debtor Affiliates. For example, in the ordinary course of business, Debtor Molycorp Minerals, LLC sells rare earth products from Mountain Pass to foreign, Non-Debtor Affiliates, such as Molycorp Silmet AS and Zibo Jiahua Advanced Material Resources Co., Ltd. ("Zibo"). In 2014, Molycorp Minerals, LLC had over $30 million in such sales to Non-Debtor Affiliates. Certain other Debtors buy from Non-Debtor Affiliates. Accordingly, at any given time, there may be balances that are due and owing from one Debtor to another Debtor and between certain Debtors and their Non-Debtor Affiliates. All balances between Debtors and Non-Debtor Affiliates are ultimately settled through cash payments, after applying any applicable setoffs. In some instances, the Intercompany Transactions are settled on a quarterly basis and, in other instances, the Intercompany Transactions are settled periodically in accordance with company procedures.

34.    The Debtors and their Non-Debtor Affiliates have taken significant steps to ensure that Intercompany Transactions are at arms' length. In connection with determining the amount to be charged for the provision of goods, the Debtors utilize transfer pricing studies conducted by third parties (the last of which was completed by KPMG LLP in 2013) to determine appropriate pricing for many of the materials associated with the Intercompany Transactions. Where no third party transfer pricing study has been completed, the Debtors and their Non-Debtor Affiliates have negotiated pricing formulas that are based on various factors. These formulas seek to determine a price as a function of the prices paid by the ultimate customers of the products and the amount of rare earth materials incorporated into such products. In addition, certain of the Non-Debtor Affiliates that are party to the Intercompany Transactions – such as Zibo and Jiangyin Jiahua Advanced Material Resources Co., Ltd – are minority-owned by a third-party and thus are incentivized to negotiate against the Debtors to obtain pricing terms

that are fair and reasonable. Accordingly, in the context of Intercompany Transactions, the

Debtors engage other Debtors and their Non-Debtor Affiliates at arms' length, just as they would

any other customer-vendor relationship.[6]

35.    The continuation of the ordinary course Intercompany Transactions will

permit the Debtors to conduct business as usual, to continue to implement their vertical

integration strategy and avoid any disruption to the detriment of the Debtors and their Non-

Debtor Affiliates. Accordingly, the Debtors submit that the continuation of these transactions is

in the best interests of the Debtors' estates and creditors.

36.    The Debtors maintain strict records of transfers of cash and can readily

ascertain, trace and account for all Inter-Debtor Transactions and Intercompany Transactions.

The Debtors will continue to maintain such records, including records of all current

intercompany accounts receivable and payable.[7]

37.    The Debtors request that, pursuant to section 503(b)(1) of the Bankruptcy

Code, all claims arising from Inter-Debtor Transactions occurring after the Petition Date be

accorded administrative expense status (collectively, "Inter-Debtor Claims"). In addition, the

Debtors respectfully request that, pursuant to section 503(b)(1) of the Bankruptcy Code, the

Court accord administrative expense status to all intercompany claims against a Debtor by

---

[6]    The Debtors engage in Inter-Debtor Transactions and Intercompany Transactions on a regular basis and such transactions are common among business enterprises similar to that of the Debtors. Accordingly, the Debtors believe the Inter-Debtor Transactions and Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, the Debtors are disclosing such transactions in this Motion out of an abundance of caution, as the continued performance of the ordinary course Inter-Debtor Transactions and Intercompany Transactions on a postpetition basis is important to the Debtors' business plan and integral to the Debtors' vertical integration strategy.

[7]    In the ordinary course of business, the Non-Debtor Affiliates also sometimes make loans between and among other Non-Debtor Affiliates to fund service operations (the "Non-Debtor Affiliate Loans"). To the extent that Non-Debtor Affiliates make Non-Debtor Affiliate Loans during the course of the Debtors' chapter 11 cases, the Debtors will maintain records of such Non-Debtor Affiliate Loans.

another Debtor or a Non-Debtor Affiliate arising after the Petition Date as a result of

Intercompany Transactions (collectively, "Intercompany Claims").  This relief has been granted

in many cases.  See, e.g., RadioShack Order; MSD Order; OnCure Order; AFA Investment

Order; Harry & David Order.

***The Preservation and Permitted Exercise of***
***Intercompany Setoff Rights Is Appropriate***

38.    The Debtors also seek authorization to preserve and exercise

intercompany setoff rights that arise through the operation of their Cash Management System.

Section 553(a) of the Bankruptcy Code provides that:

> Except as otherwise provided in this section and in sections 362
> and 363 of this title, this title does not affect any right of a creditor
> to offset a mutual debt owing by such creditor to the debtor that
> arose before the commencement of the case under this title against
> a claim of such creditor against the debtor that arose before the
> commencement of the case . . . .

11 U.S.C. § 553(a).

39.    A creditor need only establish two elements before a setoff may be

asserted:  mutuality and timing.[8]  Although courts have not uniformly defined the elements of

mutuality, most courts require the following elements: that the debts are (a) owed between the

same parties and (b) in the same right or capacity.[9]  Timing requires that both claims arise

---

[8]     See Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re The Bennett Funding
Group, Inc.), 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997); In re Lehman Bros. Inc., 458 B.R. 134, 139-40
(Bankr. S.D.N.Y. 2011); see also In re Verco Indus., 704 F.2d 1134, 1139 (9th Cir. 1983); In re Lundell
Farms, 86 B.R. 582, 584 (Bankr. W.D. Wis. 1988).

[9]     See 5 COLLIER ON BANKRUPTCY ¶ 553.03[3] (Alan N. Resnick & Henry J. Sommer eds.,
16th ed. rev. 2010); Lubman v. Sovran Bank, N.A. (In re A & B Homes, Ltd.), 98 B.R. 243, 248
(Bankr. E.D. Va. 1989); see also Cohen v. Savs. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman Asset
Mgmt. Corp.), 896 F.2d 54, 57 (3d Cir. 1990) (explaining that the right of setoff depends on the existence
of mutual debts and claims between the creditor and debtor).

prepetition.[10]  In other words, "a creditor may not set off a pre-petition claim against a post-petition debt it owes the debtor, and likewise it may not set off a post-petition claim that it has against a prepetition debt it owes to a debtor."[11]

40.    The Cash Management System and related controls allow the Debtors to track all obligations owing between related entities and thereby ensure that setoffs of Intercompany Claims will meet both the mutuality and timing requirements of section 553 of the Bankruptcy Code.  Accordingly, the Debtors respectfully request that they be expressly authorized to set off mutual prepetition obligations relating to the intercompany transactions that occurred prior to the Petition Date.

41.    In addition, section 558 of the Bankruptcy Code preserves a debtor's defenses, including setoff.  Accordingly, setoffs of debts that a debtor desires to make as a defense against a claim of a nondebtor are permissible.  As such, the setoffs requested herein are justified under section 558 as well.

42.    Similar relief has been granted in other chapter 11 cases in this District and elsewhere.  See, e.g., OnCure Order; Overseas Shipholding Grp., No. 12-20000 (Bankr. D. Del. Jan. 24, 2013); Abitibibowater Inc., No. 09-11296 (KJC) (Bankr. D. Del. June 22, 2009); see also In re Old HB, Inc. (f/k/a Hostess Brands, Inc.), No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 27, 2012); In re Oldco M Corp. (f/k/a Metaldyne Corp.), No. 09-13412 (MG) (Bankr.

---

[10]    See Cooper Jarrett, Inc. v. Cent. Transp., Inc., 726 F.2d 93, 96 (3d Cir. 1984) (noting that a creditor may not [setoff] its prepetition claims against a debt owed to a debtor which came into existence after filing the bankruptcy petition); see also Packaging Indus. Group, Inc. v. Dennison Mfg. Co. (In re Sentinel Prods. Corp.), 192 B.R. 41, 45 (N.D.N.Y. 1996) ("[T]he offset debts must be mutual, prepetition debts."); Scherling v. Hellman Elec. Corp. (In re Westchester Structures), 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995) ("Courts have interpreted debts in the same right to mean that a 'pre-petition debt cannot offset a post-petition debt.'").

[11]    Arnold M. Quittner, Setoff & Recoupment, 715 PLI/Comm 663, 694 (1995) (citing Metco Mining & Minerals, Inc. v. PBS Coals, Inc. (In re Metco Mining and Minerals, Inc.), 171 B.R. 210 (Bankr. W.D. Pa. 1994)); see also Westchester Structures, 181 B.R. at 739.

S.D.N.Y. June 22, 2009); In re Old Carco LLC (f/k/a Chrysler LLC), No. 09-50002 (AJG)

(Bankr. S.D.N.Y. May 20, 2009); In re Dana Corp., No. 06 10354 (BRL) (Bankr. S.D.N.Y. Mar.

29, 2006).

### Requests for Immediate Relief and Waiver of Stay

43.     Pursuant to Rules 6003(b) and 6004(h) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), the Debtors seek immediate entry of an order granting the

Debtors (i) the authority to continue to pay Bank Fees and (ii) a waiver of any stay of the

effectiveness of such an order.  Bankruptcy Rule 6003(b) provides, in relevant part, that

"[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court

shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to pay

all or part of a claim that arose before the filing of the petition."  Accordingly, where the failure

to grant any such requested relief would result in immediate and irreparable harm to the Debtors'

estates, the Court may allow the Debtors to pay all or part of a claim that arose before the

Petition Date prior to the twenty-first day following the Petition Date.  Bankruptcy Rule 6004(h)

provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral

is stayed until the expiration of 14 days after entry of the order, unless the court orders

otherwise."

44.     The continued use of the Bank Accounts, Cash Management System and

business forms, and the payment of Bank Fees, are necessary to prevent the immediate and

irreparable damage to the Debtors' operations.  Accordingly, the Debtors submit that ample cause

exists to justify:  (i) the immediate entry of an order granting the relief sought herein pursuant to

Bankruptcy Rule 6003(b); and (ii) a waiver of the fourteen-day stay imposed by Bankruptcy

Rule 6004(h), to the extent that it applies.

## Notice

45.      Notice of this Motion has been given to:  (i) the Office of the United

States Trustee; (ii) the Debtors' 40 largest unsecured creditors on a consolidated basis, as

identified in their chapter 11 petitions; (iii) counsel to Oaktree; (iv) counsel to the Supporting

10% Noteholders; (v) counsel to Wilmington Trust, National Association, as agent to the DIP

Lenders; (vi) counsel to Paul Weiss, as counsel to a group of secured and unsecured noteholders;

(vii) counsel to the indenture trustees for the Debtors' secured and unsecured notes; and (viii) all

parties entitled to notice pursuant to Local Rule 9013-1(m).  In light of the nature of the relief

requested, the Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as <u>Exhibit C</u>:  (i) granting the relief sought herein; and (ii) granting to the Debtors such other and further relief as the Court may deem proper.

Dated:    June 25, 2015               Respectfully submitted,
          Wilmington, Delaware

                                       /s/ *Edmon L. Morton*
                                      M. Blake Cleary (No. 3614)
                                      Edmon L. Morton (No. 3856)
                                      Justin H. Rucki (No. 5304)
                                      Ashley E. Jacobs (No. 5635)
                                      YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                      Rodney Square
                                      1000 North King Street
                                      Wilmington, Delaware 19801
                                      Telephone:  (302) 571-6600
                                      Facsimile:  (302) 571-1253

                                          -and-

                                      Paul D. Leake
                                      Lisa Laukitis
                                      JONES DAY
                                      222 East 41st Street
                                      New York, New York 10017
                                      Telephone:  (212) 326-3939
                                      Facsimile:  (212) 755-7306

                                      Ryan T. Routh
                                      JONES DAY
                                      North Point
                                      901 Lakeside Avenue
                                      Cleveland, Ohio  44114
                                      Telephone:  (216) 586-3939
                                      Facsimile:  (216) 579-0212

                                      PROPOSED ATTORNEYS FOR DEBTORS

01:17303014.1

NAI-1500406994v1

## EXHIBIT A

**Flow Chart Summarizing Cash Management System**

01:17303014.1

NAI-1500406994v1



**EXHIBIT B**

**Schedule of Bank Accounts**

| Bank | Account Holder | Account Type | Account Number[1] |
|------|----------------|--------------|-------------------|
| HSBC | Molycorp, Inc. | Foreign Account | 2001 |
| HSBC | Molycorp, Inc. | Foreign Account | 2070 |
| ING (Luxembourg) | Molycorp Luxembourg Holdings S.à r.l. | Foreign Account | 3010 |
| Oppenheimer & Co. | Molycorp, Inc. | Investment Account | 3013 |
| PNC Bank | Molycorp Chemicals & Oxides, Inc. | Operating Account | 9969 |
| PNC Bank | Magnequench International, Inc. | Operating Account | 6462 |
| PNC Bank | Molycorp Advanced Water Technologies, LLC | Limited Use Account | 8229 |
| RBC Royal Bank (Barbados) | Neo International Corp. | Foreign Account | 1239 |
| RBC Royal Bank (Barbados) | Neo International Corp | Foreign Account | 4715 |
| RBC Royal Bank (Barbados) | Magnequench Limited | Foreign Account | 6849 |
| RBC Royal Bank (Barbados) | Magnequench Limited | Foreign Account | 3673 |
| Royal Bank of Canada | Molycorp Minerals Canada ULC | Foreign Account | 6105 |
| Royal Bank of Canada | Molycorp Minerals Canada ULC | Foreign Account | 1434 |
| Royal Bank of Canada | Molycorp Minerals Canada ULC | Foreign Disbursement Account | 7180 |
| Royal Bank of Canada | Molycorp Minerals Canada ULC | Foreign Disbursement Account | 4505 |
| Royal Bank of Canada | MCP Canada Limited Partnership | Foreign Account | 8959 |
| Sumitomo Mitsui Banking Corporation | Magnequench International, Inc. | Foreign Account | 9633 |
| Swedbank AS | Molycorp Minerals, LLC | Limited Use Account | 5461 |
| The Bank of Tokyo – Mitsubishi UFJ | Magnequench International, Inc. | Foreign Account | 8704 |
| Wells Fargo | Molycorp Chemicals & Oxides, Inc. | Operating Account | 6065 |
| Wells Fargo | Molycorp Minerals, LLC | Operating Account | 8908 |
| Wells Fargo | Molycorp Minerals, LLC | Lockbox Account | 8916 |
| Wells Fargo | Molycorp Minerals, LLC | Disbursement Account | 0697 |
| Wells Fargo | Molycorp Minerals, LLC | Payroll Account | 4957 |
| Wells Fargo | Molycorp Minerals, LLC | Disbursement Account | 0344 |
| Wells Fargo | Molycorp Minerals, LLC | Overnight Account | 1507 |
| Wells Fargo | Molycorp, Inc. | Collateral Account | 4705 |
| Wells Fargo | Molycorp, Inc. | Disbursement Account | 8924 |
| Wells Fargo | Molycorp Metals & Alloys, Inc. | Lockbox Account | 5961 |
| Wells Fargo | Molycorp Metals & Alloys, Inc. | Operating Account | 6077 |
| Wells Fargo | Molycorp Rare Metals (Utah), Inc. | Operating Account | 5942 |
| Wells Fargo | Molycorp Rare Metals Holding, Inc. | Operating Account | 5959 |
| Wells Fargo | Magnequench International, Inc. | Operating Account | 6057 |
| Wells Fargo | Molycorp Advanced Water Technologies, LLC | Operating Account | 5967 |

[1]    In order to alleviate privacy concerns, this column only contains the last four digits of the account numbers

| Wells Fargo | MCP Callco ULC | U.S. Account / Foreign Operations | 5681 |
|---|---|---|---|
| Wells Fargo | MCP Canada Holdings ULC | U.S. Account / Foreign Operations | 5731 |
| Wells Fargo | MCP Exchangeco Inc. | U.S. Account / Foreign Operations | 5707 |
| Wells Fargo | Molycorp Minerals Canada ULC | U.S. Account / Foreign Operations | 5723 |
| Wells Fargo | MCP Canada Limited Partnership | U.S. Account / Foreign Operations | 5715 |
| Wells Fargo | Magnequench Limited | U.S. Account / Foreign Operations | 0228 |
| Wells Fargo | New International Corp. | U.S. Account / Foreign Operations | 0210 |
| Wells Fargo Securities | Molycorp, Inc. | Investment Account | 7147 |

**EXHIBIT C**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

----------------------------------------------------------x
                                          :

In re                                 :    Chapter 11
                                            :

MOLYCORP, INC, *et al.*,[1]        :    Case No. 15-_11357 (____)
                                            :

       Debtors.                    :    (Jointly Administered)
                                            :

----------------------------------------------------------x

## ORDER (I) APPROVING THE CONTINUED USE OF THE DEBTORS' CASH MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS, (II) PERMITTING CERTAIN INTER-DEBTOR TRANSACTIONS, INTERCOMPANY TRANSACTIONS AND SETOFF AND (III) GRANTING RELATED RELIEF

This matter coming before the Court on the Motion of the Debtors for an Order

(I) Approving the Continued Use of the Debtors' Cash Management System, Bank Accounts and

Business Forms, (II) Permitting Certain Inter-Debtor Transactions, Intercompany Transactions

and Setoff and (III) Granting Other Related Relief (the "Motion"),[2] filed by the above-captioned

debtors (collectively, the "Debtors"); the Court having reviewed the Motion and the First Day

Declaration and having considered the statements of counsel and the evidence adduced with

respect to the Motion at a hearing before the Court (the "Hearing"); and the Court having found

that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

---

[1]     The Debtors are the following 21 entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Molycorp, Inc. (1797); Industrial Minerals, LLC; Magnequench, Inc. (1833); Magnequench International, Inc. (7801); Magnequench Limited; Molycorp Advanced Water Technologies, LLC (1628); MCP Callco ULC; MCP Canada Holdings ULC; MCP Canada Limited Partnership; MCP Exchangeco Inc.; Molycorp Chemicals & Oxides, Inc. (8647); Molycorp Luxembourg Holdings S.à r.l.; Molycorp Metals & Alloys, Inc. (9242); Molycorp Minerals Canada ULC; Molycorp Minerals, LLC (4170); Molycorp Rare Metals Holdings, Inc. (4615); Molycorp Rare Metals (Utah), Inc. (7445); Neo International Corp.; PP IV Mountain Pass, Inc. (1205); PP IV Mountain Pass II, Inc. (5361); RCF IV Speedwagon Inc. (0845). Molycorp's United States headquarters is located at 5619 DTC Parkway, Suite 1000, Greenwood Village, Colorado 80111.

[2]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012, (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) notice of the Motion and the Hearing was sufficient under the circumstances, (v) cause exists, within the meaning of section 345(b) of the Bankruptcy Code to grant an interim waiver to continue their Deposit Guidelines and (vi) good cause exists to waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h) to the extent it is applicable; after due deliberation the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates and their creditors; and good and sufficient cause having been shown;

IT IS HEREBY ORDERED THAT:

1.        The Motion is GRANTED as set forth herein.

2.        The Debtors are authorized to:  (i) maintain the Cash Management System in substantially the same form as described in the Motion; (ii) implement ordinary course changes to their Cash Management System; and (iii) open and close bank accounts; provided, however, that the Debtors give notice to the Office of the United States Trustee and any official committees appointed in these chapter 11 cases within fifteen (15) days of opening or closing a bank account.  Any new domestic bank account opened by the Debtors shall be established at an institution insured by the FDIC or the FSLIC and that is organized under the laws of the United States or any State therein, or in the case of accounts that may carry a balance exceeding the insurance limitations set thereby, on the list of authorized bank depositories for the District of Delaware.

3.        The Debtors are authorized to continue to use the Bank Accounts under existing account numbers without interruption; provided, however, that no checks issued against

the Bank Accounts prior to the commencement of these chapter 11 cases shall be honored,

except as otherwise authorized by an order of this Court and directed by the Debtors.

4.     The Debtors shall not be required to include the legend "D.I.P." and the

corresponding bankruptcy case number on checks or business forms.

5.     The Debtors, having shown sufficient cause under section 345(b) of the

Bankruptcy Code, are granted a 60-day interim waiver to continue to use their Deposit

Guidelines and to invest funds in accordance with the Investment Policy; provided, however, that

if any official committee appointed in these chapter 11 cases, or any other party in interest

(including the U.S. Trustee), files an objection to maintaining the Debtors' Bank Accounts, the

Deposit Guidelines or the Investment Policy within 45 days after the date hereof and such

objection is not resolved or withdrawn before expiration of the 60-day period following the date

hereof, the Debtors shall schedule a prompt hearing before the Court to renew their request for

approval for a waiver under section 345(b) of the Bankruptcy Code; provided further, that if no

objection is timely made, the Debtors shall submit an order under certification of counsel

providing that such waiver is granted on a final basis.  The authorization of the Debtors to invest

funds pursuant to their Deposit Guidelines and Investment Policy shall be subject in all respects

to the requirements of the DIP Facility.

6.     The Banks are authorized to accept and honor all representations and

directions from the Debtors as to which checks, drafts, wires or ACH transfers should be

honored or dishonored consistent with any order of this Court and governing law, whether such

checks, drafts, wires or ACH Transfers are dated prior to, on, or subsequent to the Petition Date.

The Banks shall not be liable to any party on account of:  (i) following the Debtors' instructions

or representations as to any order of this Court; (ii) the honoring of any prepetition check or item

in a good faith belief that the Court has authorized such prepetition check or item to be honored; or (iii) an innocent mistake made despite implementation of reasonable item-handling procedures. Except for those checks, drafts, wires or ACH payments that are authorized or required to be honored under an order of the Court, no Debtor shall instruct or request any Bank to pay or honor any check, draft or other payment item issued on a Bank Account prior to the Petition Date but presented to such Bank for payment after the Petition Date.

7.    The Banks are authorized to debit the Bank Accounts in the ordinary course of business without further order of the Court for: (i) all checks drawn on the Bank Accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of Debtors' accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) all Bank Fees, including undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Banks as service charges for the maintenance of the Cash Management System.

8.    For Banks located outside of the United States, the Debtors shall file with their monthly operating reports the most recent bank balances of each such account in U.S. dollars.

9.    The Debtors are authorized, from and after the Petition Date, to continue to engage in Inter-Debtor Transactions and Intercompany Transactions in the ordinary course of the Debtors' businesses, including Intercompany Transactions with the Non-Debtor Affiliates. All Inter-Debtor Claims held by a Debtor against another Debtor arising from postpetition Inter-Debtor Transactions shall be entitled to administrative expense priority pursuant to section

01:17303014.1
NAI-1500406994v1

- 4 -

503(b)(1) of the Bankruptcy Code.  All Intercompany Claims held by a Debtor or Non-Debtor

Affiliate against a Debtor arising from postpetition Intercompany Transactions shall be entitled

to administrative expense priority pursuant to section 503(b)(1) of the Bankruptcy Code.  In

connection therewith, the Debtors shall continue to maintain current records with respect to all

transfers of cash so that all transactions, including Inter-Debtor Transactions and Intercompany

Transactions, may be readily ascertained, traced, and recorded properly on applicable

intercompany accounts.  Absent further order of the Court, the Debtors shall not make

postpetition intercompany loans to Non-Debtor Affiliates.

        10.    Pursuant to sections 553 and 558 of the Bankruptcy Code, the Debtors are

authorized, in the Debtors' sole discretion, to (a) set off mutual prepetition obligations relating to

Intercompany Transactions through the Cash Management System and (b) set off mutual

postpetition obligations relating to Intercompany Transactions through the Cash Management

System.

        11.    Notwithstanding the Debtors' use of a consolidated Cash Management

System, the Debtors shall calculate their quarterly fees under 28 U.S.C. § 1930(a)(6) based on

the disbursements of each Debtor, regardless of which Debtors' bank account the disbursement is

drawn from.

        12.    For Banks at which the Debtors hold Bank Accounts that are party to an

Uniform Deposit Agreement with the United States Trustee for the District of Delaware, within

fifteen (15) days of entry of this Order, the Debtors shall (a) contact each Bank, (b) provide each

Debtors' employer identification number and (c) identify each account held by a Debtor at such

Bank.

13.     The requirements of Bankruptcy Rule 6003(b) have been satisfied with respect to the payments authorized by this Order.

14.     This Order shall be immediately effective and enforceable upon its entry. To the extent that it may be applicable, the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is hereby waived.

15.     The Debtors are hereby authorized to take such actions and to execute such documents as may be necessary to implement the relief granted by this Order.

16.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: _____, 2015
      Wilmington, Delaware          _____
                                  UNITED STATES BANKRUPTCY JUDGE