

1156 15th St. NW, Suite 1250
Washington, D.C. 20005
(202) 795-9300
www.rcfp.org

Bruce D. Brown
Executive Director
bbrown@rcfp.org
(202) 795-9301

STEERING COMMITTEE

STEPHEN J. ADLER
*Reuters*
SCOTT APPLEWHITE
*The Associated Press*
WOLF BLITZER
*CNN*
DAVID BOARDMAN
*Temple University*
CHIP BOK
*Creators Syndicate*
JAN CRAWFORD
*CBS News*
MICHAEL DUFFY
*Time*
RICHARD S. DUNHAM
*Tsinghua University, Beijing*
ASHLEA EBELING
*Forbes Magazine*
SUSAN GOLDBERG
*National Geographic*
JOHN C. HENRY
*Freelance*
NAT HENTOFF
*United Media Newspaper Syndicate*
DAHLIA LITHWICK
*Slate*
TONY MAURO
*National Law Journal*
JANE MAYER
*The New Yorker*
DOYLE MCMANUS
*Los Angeles Times*
ANDREA MITCHELL
*NBC News*
SCOTT MONTGOMERY
*NPR*
MAGGIE MULVIHILL
*Boston University*
JEFFREY ROSEN
*The National Constitution Center*
CAROL ROSENBERG
*The Miami Herald*
THOMAS C. RUBIN
*Seattle, Wash.*
ERIC SCHMITT
*The New York Times*
MARGARET LOW SMITH
*The Atlantic*
JENNIFER SONDAG
*Bloomberg News*
PAUL STEIGER
*Pro Publica*
PIERRE THOMAS
*ABC News*
SAUNDRA TORRY
*USA Today*
JUDY WOODRUFF
*PBS/The NewsHour*

*Affiliations appear only
  for purposes of identification.*

January 16, 2016

The Hon. Christopher S. Sontchi
United States Bankruptcy Judge
U.S. Bankruptcy Court, Dist. of Delaware
*Submitted by the CM/ECF system*

**Re: Order of Jan. 14 in *In re Molycorp, Inc., et al.*, No. 15-11357**

Dear Judge Sontchi:

On behalf of the news media organizations listed below, we write as *amici curiae* to support the motion filed today by Bloomberg LP, and to urge you to modify the order entered yesterday demanding disclosures from 123 individual representatives of the parties to the mediation in the above-referenced bankruptcy, regarding their possible contacts with any of the more than 2,400 reporters from Bloomberg.

As Bloomberg argues, the order will sweep up conversations its reporters may have had regarding Molycorp that did not involve any matters relevant to the mediation. This investigation will improperly interfere with journalists' First Amendment rights as they gather the news and report on these matters, and not only in this proceeding. While the court has a legitimate interest in examining a possible violation of its confidentiality order, we ask the court to take steps to ensure that it does not unnecessarily intrude into the constitutionally protected newsgathering activities of reporters. An overly broad investigation into sources will necessarily chill other sources from talking to journalists and deprive the public of information.

Confidential reporter-source relationships are essential to the news media, and investigations into leaks of sealed or otherwise confidential information must be undertaken with great care. In examining the question of how to proceed when journalists' sources and materials are involved, it is instructive that the U.S. Department of Justice has long recognized significant restrictions on its own actions:

> Because freedom of the press can be no broader than the freedom of members of the news media to investigate and report the news, the Department's policy is intended to provide protection to members of the news media from certain law enforcement tools, whether criminal

> or civil, that might unreasonably impair newsgathering activities. … In determining whether to seek information from, or records of, members of the news media, the approach in every instance must be to strike the proper balance among several vital interests … .

*Policy regarding obtaining information from, or records of, members of the news media; and regarding questioning, arresting, or charging members of the news media,* 28 C.F.R. s. 50.10(a)(1), (2) (2015).

It is this governmental restraint that is essential to journalism; once journalists' sources are swept up in legal proceedings, whether by virtue of subpoenas to reporters or an interrogation of the sources themselves, they are invariably chilled from participating in the reporting of important public events.

As Justice Powell has pointed out, competing interests must be balanced when a reporter's sources are being sought:

> The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions."

*Branzburg v. Hayes*, 408 U.S. 665, 743 (1972) (Powell, J., concurring).

*Amici* also note that when a court or litigant demands that journalists reveal their sources of information, one of the arguments that the news media typically asserts is that the party must have exhausted all alternative sources of the information. *See, e.g., Branzburg* at 743 (Stewart, J., dissenting). While that is an important step, it is nonetheless essential to limit the scope of any investigation to sources and contacts that are directly related to the order this court believes has been breached. The present order is not thus limited, and is overly broad; it would make journalists' jobs impossible if this were how such investigations were always handled.

Journalists depend on a network of sources to guide the direction of their reporting. Rarely can journalists cover stories as complex as a bankruptcy proceeding and then spontaneously report on it. Rather, they must dig and question and interview until they develop a story that meaningfully communicates the important issues to an audience that may not be familiar with financial, legal and bankruptcy issues. As Walter Cronkite stated in the early 1970s, "Without [confidential sources], I would be able to do little more than broadcast press releases and public statements." Newsmen's Privilege: Hearings Before the Subcomm. on Constitutional Rights of the Comm. on the Judiciary, 93rd Cong. (1973).

Intrusion into reporter-source relationships frightens sources into silence. As Justice Potter Stewart has said, "When neither the reporter nor his source can rely on the shield of confidentiality against unrestrained use of [government] power, valuable information will not be published and the public dialogue will inevitably be impoverished."

*Branzburg* at 736 (Stewart, J., dissenting).  We submit it should make little difference if the target of the government's inquiry is the journalist or the source, especially when the instrument employed is of such a sweepingly broad nature.

When journalists cannot promise confidentiality to those they interview, stories of public importance go untold.  This is not a hypothetical concern, as former Fox News reporter Jana Winter can attest.  After a Colorado court issued a subpoena requesting that Winter divulge her source for a story she wrote on the July 2012 Aurora theater shooting and then conducted its own investigation by questioning police officers as possible sources, "dozens of individuals across the country . . . were suddenly unwilling to return my calls."  Statement of Jana Winter to the Colorado Senate Judiciary Committee, Jan. 14, 2014, available at http://fxn.ws/1iqT4Hc.  As a result, stories about "national security, terrorism, and government corruption never saw the light of day . . . ." *Id.*

Likewise, after it was revealed that the government had subpoenaed Associated Press phone records and searched Fox News reporter James Rosen's email, reporters noticed a sea change in sources' willingness to talk.  *See* Dylan Byers, Reporters Say There's a Chill in the Air, Politico, June 8, 2013, http://politi.co/1c7Xkrv.  *The New York Times* and Associated Press said their reporters found that sources were suddenly fearful to return phone calls.  *Id.*  Gary Pruitt, the president and CEO of The Associated Press, said at the time,

> What I heard from our journalists should alarm everyone in this room.  The actions of the DOJ against AP are already having an impact beyond the specifics of this case.  Some longtime trusted sources have become nervous and anxious about talking with us -- even on stories unrelated to national security.  In some cases, government employees we once checked in with regularly will no longer speak to us by phone. Others are reluctant to meet in person.  In one instance, our journalists could not get a law enforcement official to confirm a detail that had been reported elsewhere.  Imagine: officials were so fearful of talking to AP they wouldn't even confirm a fact that had already been reported by numerous other media.

Gary Pruitt, Address to the National Press Club, June 19, 2013, available at http://www.ap.org/Content/Press-Release/2013/Gary-Pruitt-address-to-National-Press-Club.

The importance of keeping confidential sources confidential cannot be overstated.  The repercussions from a single legal demand affect not just the work of the targeted journalist but all other journalists whose sources will hesitate and hold back information on matters of public concern, such as the operation of the judicial system.  There is little doubt that many of the individuals who can thoughtfully discuss important business, financial and bankruptcy issues with reporters will be fearful to speak to reporters in the future if they learn that this court has conducted such a sweeping investigation into an alleged improper disclosure, and important matters of public interest may well go unreported.

Restraint in this court's investigation would be consistent with the long history of a press that is free to report important controversies. We request that this court narrow the scope of this order so that reporting on matters of significant public concern can continue with the freedom ensured by the First Amendment.

Sincerely,


The Reporters Committee for Freedom of the Press
The Associated Press
First Look Media, Inc.
Gannett Co., Inc.
The McClatchy Company
National Public Radio, Inc.
Tribune Publishing Company
The Washington Post

**Description of media organizations**

The Reporters Committee for Freedom of the Press is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided assistance and research in First Amendment and Freedom of Information Act litigation since 1970.

The Associated Press ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York, and owned by its 1,500 U.S. newspaper members. The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers. The AP operates from 300 locations in more than 100 countries. On any given day, AP's content can reach more than half of the world's population.

First Look Media, Inc. is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

Gannett Co., Inc. is an international news and information company that publishes 93 daily newspapers in the United States, including The El Paso Times and USA TODAY. Each weekday, Gannett's newspapers are distributed to an audience of 9 million readers and the websites associated with the company's publications serve online content to 95 million unique visitors each month.

The McClatchy Company, through its affiliates, is the third-largest newspaper publisher in the United States with 29 daily newspapers and related websites as well as numerous community newspapers and niche publications.

National Public Radio, Inc. is an award-winning producer and distributor of noncommercial news programming. A privately supported, not-for-profit membership organization, NPR serves a growing audience of more than 26 million listeners each week by providing news programming to 285 member stations that are independently operated, noncommercial public radio stations. In addition, NPR provides original online content and audio streaming of its news programming. NPR.org offers hourly newscasts, special features and 10 years of archived audio and information.

Tribune Publishing Company is one of the country's leading publishing companies. Tribune Publishing's ten daily publications include the Chicago Tribune, Los Angeles Times, The Baltimore Sun, Sun Sentinel (South Florida), Orlando Sentinel, Hartford Courant, The Morning Call, Daily Press, Capital Gazette, and Carroll County Times. Popular news and information websites, including www.chicagotribune.com and www.latimes.com, complement Tribune Publishing's publishing properties and extend the company's nationwide audience.

WP Company LLC (d/b/a The Washington Post) publishes one of the nation's most prominent daily newspapers, as well as a website, www.washingtonpost.com, that is read by an average of more than 20 million unique visitors per month.

## Certificate of Service

On January 16, 2016, this letter was filed through the Court's ECF system and has been served on all parties registered as filers with ECF.

/s/ Bruce D. Brown
Bruce D. Brown
The Reporters Committee for Freedom of the Press
1156 15th Street NW, Suite 1250
Washington, D.C. 20005
bbrown@rcfp.org
(202) 795-9301