IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Bank. No. 15-11357-CSS |
| MOLYCORP, INC., et al., ) | |
| ) | |
| Debtors. ) | |

| | |
|---|---|
| OCM MLYCO CTB LTD., ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | Civ. No. 16-286-GMS |
| ) | |
| AD HOC 10% NOTEHOLDERS, ) | |
| ) | |
| Appellee. ) | |

| | |
|---|---|
| OCM MLYCO CTB LTD., ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | Civ. No. 16-288-GMS |
| ) | |
| AD HOC 10% NOTEHOLDERS, ) | |
| ) | |
| Appellee. ) | |

**MEMORANDUM ORDER**

At Wilmington this 23rd day of August, 2016, having reviewed the papers submitted to me as duty judge assigned to resolve the pending "emergency motion of appellant for stay pending appeal," and having heard oral argument on the same;

IT IS ORDERED that said motion (D.I. 18) is denied, for the reasons that follow:

1. **Background.** Appellant OCM MLYCo CTB Ltd. ("Oaktree") and appellees JHL Capital Group Holdings One LLC, QVT Fund V LP, QVT Fund IV LP, and Quintessence Fund L.P. (collectively referred to as the "Ad Hoc Group"[1]) lent money to now-bankrupt Molycorp, Inc.,[2] a rare earth mining company that principally extracted rare earth minerals out of the Mountain Pass mine in San Bernardino, California. More specifically, Oaktree and the Ad Hoc Group of 10% Noteholders held *pari passu* collateral rights in the assets of the Mountain Pass mining business ("MP Assets"), which rights were governed by a prepetition collateral agency agreement ("the CAA").[3] The CAA states that each of Oaktree and the 10% Noteholders "acknowledges and agrees that the payment and satisfaction of all of the Secured Obligations will be secured **equally and ratably** . . . ." (D.I. 18 at 1, CAA § 3(c)(iii))[4] (emphasis added) The CAA further provides that "all moneys or other property held by the Collateral Agent . . . shall, to the extent available for distribution, be distributed . . . **equally and ratably**." (*Id.* at 2, CAA § 4(d)) (emphasis added) After commencement of the above captioned bankruptcy proceedings, a global deal was reached through mediation. As part of the

---

[1] It is unclear from the record presented to me whether other creditors are included in the Ad Hoc Group, and whether "10% Noteholders" is a different nomenclature for the same set of creditors. I will use the two terms interchangeably, as they appear to be used in the papers submitted to the court.

[2] Together with its affiliated debtors and debtors in possession in the above captioned bankruptcy case, "the debtors."

[3] As far as I can discern, a copy of the CAA was not provided to me in connection with this emergency matter, nor was a docket item referenced so I could review the CAA.

[4] All docket item references shall be to Civ. No. 16-288-GMS.

deal, Oaktree and the 10% Noteholders would "credit bid" a *pro rata* portion of their claims for some of the MP Assets (the mineral rights and certain intellectual property), with equity in an acquisition vehicle, Secured Natural Resources LLC ("SNR"), distributed in proportion to their claims. Definitive documentation had to be "reasonably acceptable" to Oaktree, defined as "in form and substance consistent with," among other documents, the CAA. (*Id.* at 2, Settlement Agreement ¶ 3[5])

3. Oaktree is entitled to a 35.283% interest in SNR. The Ad Hoc Group drafted an LLC Agreement for SNR that vested members of the Ad Hoc Group with all of the significant corporate governance of SNR. Oaktree refused to sign a joinder to the LLC Agreement, accept its SNR Common Units, or become a member of SNR. Oaktree thereafter brought the matter to the bankruptcy judge, who ruled from the bench that the LLC Agreement was not inconsistent with the terms of the Settlement Agreement and the CAA. More specifically, the bankruptcy judge concluded that the CAA term "equally and ratably" does not apply to corporate governance rights but, rather, is "focused on the distribution of the membership interest to make sure that they fairly and accurately reflect the agreement under the [CAA] as to who [gets] what percentage." (D.I. 20, ex. 2 at 31-32[6]) The bankruptcy judge declined to engage himself "in negotiations over what the LLC agreement does or doesn't provide in connection with its corporate governance" (*id.*, ex. 2 at 32), stating that "how that acquisition vehicle [SNR] operates going forward with its corporate structure . . . is something beyond my

---

[5]Another document not made available to me for review.

[6]Appellee did provide copies of the hearing transcripts with the bankruptcy judge's rulings.

3

control" and a matter "between the parties" that should be resolved in the Court of Chancery (*id.*, ex. 1 at 40-41). In this regard, the record indicates that Oaktree did not negotiate for any governance rights in the Settlement Agreement, a representation not disputed by counsel at the hearing.[7] (*Id.*, ex. 1 at 35-43) Nor did Oaktree move to stay the rulings pending appeal.

 4. Oaktree filed a timely appeal from the bankruptcy judge's rulings. The parties agreed to engage in mediation efforts, with the mediation scheduled to take place in September. In connection with mediation, counsel for the Ad Hoc Group represented that SNR would take no action that would "disparately impact Oaktree." (D.I. 19 at 2 n.4) On August 11, 2016, Oaktree received solicitation materials from SNR in connection with a rights offering ("the Offering") having a return date of August 23, 2016 at 5:00 p.m. According to Oaktree, the Offering "effectively forces Oaktree to pay SNR $2.1 million to retain its 35% stake in SNR or be diluted to a 5.8% stake." (D.I. 18 at 3) According to the Ad Hoc Group, the LLC Agreement, as approved by the bankruptcy judge, "provides that the SNR board is authorized to determine if and when to raise capital," and the Offering "employs the fairest method possible of raising capital, by providing each eligible participant the right to maintain its equity ownership percentage by purchasing its pro rata share of the offered securities. . . . Oaktree has the same right to participate and the same consequences of not participating as any other eligible participant, including the Ad Hoc Group members." (D.I. 19 at 4) Oaktree responds in essence that it is disinclined to invest in a company controlled by others.

---

 [7]Indeed, the bankruptcy judge told counsel for Oaktree that he could not "negotiate for you." (*Id.*, ex. 1 at 43)

4

5. **Jurisdiction and standard of review.** The district court has jurisdiction over bankruptcy appeals pursuant to 28 U.S.C. § 1334. Although Bankruptcy Rule 8007 provides that, "**[o]rdinarily**, a party must move first in the bankruptcy court" to stay an order of the bankruptcy court (B.R. 8007(a)(1), emphasis added), under the circumstances at bar, with the parties already engaged in mediation in the district court, I conclude that I have jurisdiction to consider the motion to stay.

6. A party moving for a stay pending appeal has the burden of showing the following four factors:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991) (citing *Hilton v. Braunskill*, 481 U.S. 770 (1987); *see also In re Freedom Communications Holdings, Inc.*, 2009 WL 4506553 (D. Del. Dec. 4, 2009), at *1; *In re Genesis Health Ventures, Inc.*, 367 B.R. 516, 520 (Bankr. D. Del. 2007). According to the Third Circuit in *In re Revel AC, Inc.*, 802 F.3d 558 (3d Cir. 2015),

> "[T]he most critical" factors . . . are the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success and (2) that it will suffer irreparable harm - the latter referring to "harm that cannot be prevented or fully rectified" by a successful appeal. . . . Though both are necessary, the former is arguably the more important piece of the stay analysis. As Judge Posner has remarked, it isn't enough that the failure to obtain a stay will be "a disaster" for the stay movant but only a "minor inconvenience to the defendant," as "[e]quity jurisdiction exists only to remedy legal wrongs; [thus,] without some showing of a probable right[,] there is no basis for invoking it.". . . For our Court, a sufficient degree of success for a strong showing exists

5

Case 1:16-cv-00285-GMS Document 21 Filed 08/24/16 Page 6 of 7 PageID #: 1021
Case 15-11357-CSS Doc 2192 Filed 08/23/16 Page 6 of 7

if there is "a reasonable chance, or probability, of winning."
*Id.* at 568 (citations omitted).

7. **Likelihood of success on the merits.** In this regard, Oaktree argues that, because the bankruptcy court erred as a matter of law in allowing the Ad Hoc Group "to disenfranchise Oaktree and distribute governance rights unequally in clear violation of the parties' agreements," Oaktree is likely to succeed on the merits. (D.I. 18 at 4) Oaktree supports its argument with a nod to New York law, which governs the CAA and provides that, "where a contract is 'complete, clear and unambiguous on its face,' the contract 'must be enforced according to the plain meaning of its terms.'" (*Id.* at 4, n.12, citing *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 177 (2d Cir. 2004)). As noted, however, none of the contracts at issue have been provided to the court,[8] and it is apparent from the record provided that Oaktree failed to negotiate for the very governance rights to which it now claims entitlement in either the CAA or the Settlement Agreement, which documents form the basis for the LLC Agreement and the disputed contract language. I cannot conclude that Oaktree has demonstrated a reasonable chance of winning the appeal.

8. **Irreparable harm.** Oaktree argues that it will suffer irreparable harm in the "severe dilution" of its stock, citing to Delaware corporate law.[9] (D.I. 18 at 5) At oral argument, Oaktree also speculates that, absent a stay, the Ad Hoc Group will use their

---

[8] It is not even clear from the docket whether such documents are included in the "designation of record." (D.I. 6)

[9] Of course, Oaktree admittedly had recourse to the equitable remedies available through the Court of Chancery, as suggested by the bankruptcy judge.

6

governance rights to waste the corporate assets of SNR. When considering the threat of harm alleged under the circumstances at bar,[10] I cannot identify any evidence of record that Oaktree will suffer injuries that cannot be remedied by money damages.

9. **Balancing the equities.** I note from the outset that the Ad Hoc Group has provided no reasonable explanation for proceeding with the Offering before the scheduled mediation.[11] Indeed, it is my impression that the litigation spawned by the bankruptcy of Molycorp, Inc. has taken on a personal edge, and that none of the parties at bar are acting out of business necessity. Although it is of no moment given my decisions above, I find the equities weigh in Oaktree's favor.

10. **Conclusion.** For the reasons stated above, I conclude that Oaktree has not carried its burden to demonstrate that a stay pending appeal is warranted. The motion to stay is denied, without prejudice to renew before the assigned district judge.

_____
United States District Judge

---

[10] Including the fact that Oaktree has declined to participate in the Offering and, therefore, has all but guaranteed a dilution of its stock. Moreover, according to the Ad Hoc Group, dilution cannot be characterized as an irreparable injury absent a freeze-out, a scenario not applicable to the facts at bar. (Transcript at 23-24)

[11] I understand that, at some point, SNR might have to raise capital to fund its operations, but since it simply holds mineral and intellectual property rights, I am not convinced that its capital needs were of an exigent nature.

7